IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    v.                                                      23-CR-6104-CJS

SHANE ANTHONY SCACCIA,

           Defendant.

---

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Brett A. Harvey, Assistant United States Attorney, hereby makes and files its sentencing memorandum relating to the defendant, SHANE ANTHONY SCACCIA.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

**A.    PROCEDURAL HISTORY**

On June 1, 2023, a federal grand jury returned a five-count Indictment charging the defendant, SHANE ANTHONY SCACCIA, with one count of dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and four counts of possession and/or transfer of machineguns, in violation of 18 U.S.C. § 922(o)(1). (Dkt. No. 48). The charges were based on the defendant's involvement in possessing and selling machineguns – consisting of "Trigger Control Group Travel Reducers" and "Drop-In Auto Sear[s]," which are commonly known as "machinegun conversion devices" or "MCDs" – and firearm silencers to individuals located throughout the United States.

On December 18, 2023, the defendant pleaded guilty, without a plea agreement, to the Indictment. (Dkt. 69).

In the Pre-Sentence Investigation Report (PSR), the Probation Office calculated the applicable Sentencing Guidelines. Specifically, they applied a base offense level of 22 under Guidelines § 2K2.1(a)(3) because the defendant has a prior conviction for a "crime of violence" (a Youthful Offender adjudication for Assault in the Second Degree) and the instant offenses involved firearms described in 26 U.S.C. § 5845(a) (PSR at ¶ 28); a six-level increase under Guidelines § 2K2.1(b)(1)(C) because the offenses involved between 25 and 99 firearms (*Id.* at ¶ 29); and a three-level decrease under Guidelines § 3E1.1 based on the defendant's acceptance of responsibility. (*Id.* at ¶¶ 35 and 36). In addition, the Probation Office calculated a Criminal History Category (CHC) IV for the defendant. (*Id.* at ¶¶ 41-48). With a total offense level 25 and CHC IV, the defendant's advisory sentencing range is 84 to 105 months' imprisonment. (*Id.* at ¶ 55).[1]

**B.   SUMMARY OF OFFENSE AND RELEVANT CONDUCT**

The PSR sets forth the facts and circumstances of the offenses of conviction in detail. Briefly, the defendant operated an "expansive" online business where he sold hundreds of MCDs, as well as a significant number of firearm silencers, to customers throughout the United States between at least March 2020 and April 2021. (PSR at ¶¶ 13 and 18). The

---

[1] It should be noted that the government, in a filing titled "Government's Calculation of Maximum Sentence and Sentencing Guideline Range," calculated the defendant's advisory sentencing range to be 57 to 71 months' imprisonment. (Dkt. 58, at ¶ 11). The government, however, was not aware of the defendant's Youthful Offender adjudication at the time of that filing. Because the defendant pleaded guilty to the Indictment without a plea agreement, the government is free to advocate for the Sentencing Guidelines calculations contained in the PSR. (*Id.* at ¶ 12).

2

defendant sold MCDs for Glock handguns and AR-15-style rifles and manufactured plastic MCDs using 3-D printers. (*Id.* at ¶ 12). The defendant would typically negotiate the sales of MCDs and silencers using a Facebook account and/or a Gmail account, both of which were under an alias ("Dan Cuminale"). Prospective customers would contact the defendant through the Facebook or Gmail accounts and inquire about the availability of MCDs and/or silencers for sale. The defendant would refer to the MCDs and silencers using code words (such as "bottle openers," "wall hangers," and "door stops" for MCDs, and "fuel filters," "filters," and "solvent traps" for silencers) and communicate to the prospective customers what type(s) and quantity(ies) of MCDs and silencers he had available for sale and the price(s) for which he was selling them. After reaching an agreement on the terms of sale, the defendant would ship the MCDs and/or silencers through the mail to his customers and accept payment through Paypal and other online payment applications. (*Id.* at ¶¶ 11-13).

During the investigation, the ATF used a confidential source (CS) and undercover agent (UC) to make controlled purchases of MCDs and silencers from the defendant. The CS purchased 14 plastic MCDs and a silencer from the defendant online for $180 in March 2021. (*Id.* at ¶ 15).[2] In addition, the UC purchased a stainless-steel MCD from the defendant for $125 in cash on March 23, 2021,[3] and 15 plastic MCDs and a silencer from defendant for $115 on April 12, 2021. (*Id.* at ¶¶ 16 and 17).[4]

---

2  This conduct underlies Count 2 of the Indictment.

3  This conduct underlies Count 3 of the Indictment.

4  This conduct underlies Count 4 of the Indictment.

3

At the conclusion of the investigation, the ATF executed a search warrant at the defendant's residence at 52 Clark Street, Apartment 78, Brockport, New York. During the search warrant, the ATF recovered, *inter alia*, 14 plastic auto sears for an AR-style firearm,[5] 12 silencers, parts of eight (8) auto sears for a Glock handgun, six 3-D printers, 3-D printing materials, United States Postal Service envelopes and packaging materials, several firearms, hundreds of rounds of ammunition (various calibers), firearms parts and accessories, quantities of marijuana, and three marijuana pipes. (PSR at ¶ 20).

## II. STATUTORY SENTENCING FACTORS

For the reasons set forth below, the government respectfully asks this Court to impose a sentence of 96 months' imprisonment, which is the middle of the sentencing range contained in the PSR. Such a sentence is justified and appropriate for this defendant – a five-time convicted criminal who indiscriminately sold hundreds of MCDs and numerous firearm silencers to customers throughout the United States without regard for the safety and welfare of the community – and would not be "greater than necessary" to comply with the objectives set forth in 18 U.S.C. § 3553(a) (hereinafter, "Section 3553(a)").

Section 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." In determining the appropriate sentence, the Court must consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just

---

[5] This conduct underlies Count 5 of the Indictment.

4

punishment for the offense; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to protect the public from further crimes of the defendant; the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In executing these statutory responsibilities, the Court must first correctly calculate the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). This range is "the starting point and the initial benchmark." *Id.* Although this Court must treat the Guidelines as advisory, *United States v. Ratoballi*, 452 F.3d 127, 131-32 (2d Cir. 2006), an error in determining the applicable Guidelines range or the availability of departure authority nonetheless would be the type of procedural error that could render a sentence unreasonable on appellate review. *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005). Further, while this Court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351 (2007), the Second Circuit has observed that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). *See also United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008).

Next, after giving the parties an opportunity to argue for whatever sentence they deem appropriate (consistent with any limitations imposed by the plea agreement), this Court must

5

then "consider all the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In determining whether the section 3553(a) factors support the requested sentence, the Court "must make an individualized assessment based on the facts presented." *Id.* at 50. In that regard, "[n]o limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. If a non-Guidelines sentence is warranted, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

After settling on the appropriate sentence, the Court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* (citing *Rita*, 551 U.S. at 351). Although this Court need not engage in "robotic incantations" with respect to its consideration of the section 3553(a) factors, *Fernandez*, 443 F.3d at 30, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita*, 551 U.S. at 356.

In this case, the section 3553(a) factors weigh strongly in favor of a significant prison sentence. The nature and circumstances of the offenses committed by the defendant – the possession and transfer of MCDs and firearm silencers – is exceptionally serious. MCDs are used to convert an already-lethal handgun or AR-style rifle into a fully automatic weapon able to rapidly unleash dozens of shots with a single pull of the trigger. Machineguns pose an "immense danger," *United States v. O'Brien*, 560 U.S. 218, 230 (2010), owing to "their

destructive potential and exacerbation of serious crime." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 316 (D.C. Cir. 2022); *see also United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns."). In recent years, the illegal possession and use of machinegun conversion devices have become a serious and growing problem. *See* Ernesto Londoño and Glenn Thrush, *Inexpensive Add-on Spawns a New Era of Machine Guns*, NEW YORK TIMES (Aug. 12, 2023) ("These makeshift machine guns – able to inflict indiscriminate carnage in seconds – are helping to fuel the national epidemic of gun violence, making shootings increasingly lethal, creating added risks for bystanders and leaving survivors more grievously wounded, according to law enforcement authorities and medical workers."); Peter Hermann, *D.C. Police See Rise in Devices that Convert Guns into Fully Automatic Weapons*, WASHINGTON POST (Sept. 4, 2021). Between 2019 and 2023, "the number of suspected MCDs recovered in crimes by law enforcement and subsequently traced by ATF has increased rapidly with more than a 784% increase in recoveries and traces between 2019 (658) and 2023 (5,816)." *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, National Firearms Commerce and Trafficking Assessment, Vol. 4: Privately Made Firearms Updates and New Analysis, *available at* https://www.atf.gov/firearms/docs/report/nfcta-volume-iv-part-v---pmf-updates-and-new-analysis/download (last visited Jan. 27, 2025).

Here, the defendant indiscriminately sold MCDs and silencers to customers over the Internet. He did so knowing that it was illegal and without knowing who the customers were or for what actual purpose(s) the customers intended to use the MCDs and silencers. By engaging in this dangerous business in this manner, the defendant created an incalculable risk

7

that the MCDs and/or silencers would fall into the wrong hands and be used for nefarious purposes. The defendant effectively admitted to creating this risk during the controlled purchase by the UC on April 15, 2021. The UC told the defendant how much he enjoyed using the MCD that the UC previously purchased from the defendant. The defendant responded, "no one uses this shit [meaning the MCDs] for bad," but acknowledged that "you get a couple of bad eggs here and there." This startling admission by the defendant shows that he was not simply selling the MCDs without appreciating the risk that he was creating; rather, it shows that he was consciously creating that risk without regard for the potential dangers that MCDs pose to human life and the community.

In addition, some of the defendant's customers were members of, or shared ideologies with, violent extremist groups, including the "Boogaloo Bois." (PSR at ¶ 13).[6] One such individual – Michael Paul Dahlager, a self-described member of the Boogalo Bois – used Facebook to purchase ten MCDs and a silencer from the defendant in April and May 2020. (*Id.*).[7] The defendant objects to the reference in the PSR about the defendant's customers' involvement with violent extremist groups, arguing that he "has no knowledge of the affiliations of individuals with whom he may have interacted on social media or to whom he may have transferred any items alleged herein." (Dkt. 83, at 12). The government

---

6 The "Boogaloo Bois" is a loosely organized group of individuals who espouse violent anti-government sentiments. The term "Boogaloo" itself refers to an impending second civil war in the United States.

7 Dahlager was prosecuted in the District Minnesota for possessing two MCDs and sentenced to 24 months' imprisonment, which was the top of his advisory sentencing range. Court filings show that, in addition to being a member of the Boogalo Bois, Dahlager made recorded statements about his "propensity for violence" and that he would "go out fighting . . . go hunt some pig," referring to law enforcement. (Dkt. 34, Case No. 21-CR-120, District of Minnesota, at 1, 3, and 4). It should be noted that the Dahlager, unlike the defendant, was a CHC I and was not involved in selling MCDs and silencers over the Internet.

acknowledges that it does not have sufficient evidence to show the defendant knew the specific ideological affiliation(s) of his customers. Nonetheless, the fact that the MCDs and silencer ended up in the possession of a dangerous extremist illustrates the government's concerns that the defendant was creating a substantial risk that the MCDs and silencers would end up in the hands of the individuals with malicious intent.

As detailed above, the defendant is a CHC IV. (PSR at ¶¶ 41-48). He has a prior Youthful Offender adjudication for Assault in the Second Degree (Intent to Cause Serious Physical Injury) from 2007, which involved an incident in which the defendant formulated a plan to assault a male victim ("Victim 1"), lured Victim 1 to his residence, assaulted Victim 1, and threatened to kill Victim 1 if Victim 1 reported the assault to law enforcement authorities. (*Id.* at ¶ 41). The defendant violated his probation for this offense three times: once by getting arrested for Robbery in Third Degree/Petit Larceny, once for marijuana use, and once by getting arrested for Criminal Contempt in the Second Degree. (*Id.*). The defendant also has misdemeanor convictions for Petit Larceny from 2012, which involved an incident where he pushed down a female victim (Victim 2) and stole $80 from her bra (*Id.* at ¶ 42); Criminal Contempt in the Second Degree from 2012, which involved an incident where the defendant violated an order of protection that had been issued after the defendant assaulted and harassed another female victim (Victim 3) (*Id.* at ¶ 43); Petit Larceny from 2017, which involved an incident where the defendant "became physically violent" and stole a firearm from another female victim (Victim 4) (*Id.* at ¶ 44); and Driving While Intoxicated from 2018, which involved an incident where the defendant operated a motorcycle while intoxicated and had an accident with another vehicle. (*Id.* at ¶ 45).

This case does not involve a novice criminal who made an isolated mistake or lapse in judgment. Rather, it involves a defendant who squandered multiple opportunities to change his ways, who chose to operate an illicit business for more than a year (while on probation for two prior offenses), and who endangered the safety and welfare of the community in the process. The defendant's criminal history and conduct in this case demonstrate his inability or unwillingness to live a law-abiding life and his utter disregard for the rule of law.

Given the gravity of the offenses committed by the defendant and his criminal history, the government respectfully requests a sentence of 96 months' imprisonment. Such a sentence would adequately account for the nature and circumstances of the offenses, the criminal history and personal characteristics of the defendant, the seriousness of the offenses, and the need to protect the public from further crimes by the defendant. In addition, such a sentence would promote respect for the law and deter the defendant, and others in this District and elsewhere in the United States, from endangering the community by trafficking MCDs and silencers.

The government notes that the number of MCDs involved in this case did not factor into the Sentencing Guidelines calculations because the definition of "firearm" under Guidelines § 2K2.1(b) does not include machineguns. However, Application Note 11 of Guidelines § 2K2.1 provides, in pertinent part, that "[a]n upward departure may be warranted [where] the offense involved multiple National Firearms Act weapons," such as machineguns. The government is not seeking an upward departure on this ground but respectfully requests that, given the significant number of MCDs possessed and trafficked by

10

the defendant and the other aggravating factors present in this case, the Court impose the 96-month prison sentence requested by the government.

### III. CONCLUSION

Based on the foregoing, the government respectfully recommends that the Court impose a sentence of 96 months' imprisonment.

DATED: Rochester, New York, January 27, 2025.

>Respectfully submitted,
>
>TRINI E. ROSS
>United States Attorney
>Western District of New York

BY: *(signature)*

>BRETT A. HARVEY
>Assistant United States Attorney
>United States Attorney's Office
>Western District of New York
>100 State Street, Suite 500
>Rochester, New York 14614
>585/399-3949
>brett.harvey@usdoj.gov